UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

C.D. BARNES ASSOCIATES, INC.

        Plaintiff/Counter-Defendant,

v.                                    Case No. 1:04-CV-850

GRAND HAVEN HIDEAWAY LIMITED        HON. GORDON J. QUIST
PARTNERSHIP, et al.,

        Defendants/Cross-Defendants.

and

STOCK BUILDING SUPPLY, LLC, et al.,

        Defendants/Cross/Counter/Third-Party
        Plaintiffs,

and

JEDCO DELCON CORPORATION, et al.,

        Third-Party Defendants,

and

CHERRY VALLEY CONCRETE, INC.,

        Counter/Third-Party Plaintiff.

_____/

**OPINION**

This case arises out of the construction of a multi-family housing project known as Grand Haven Hideaway at Lakeshore Drive (the "Project").  Defendant/Cross-Defendant Grand Haven Hideaway Limited Partnership ("GHHLP") was the owner and developer of the Project, and

Plaintiff/Counter-Defendant C.D. Barnes Associates, Inc. ("C.D. Barnes") was the general contractor on the Project.  Centennial Mortgage, Inc. ("Centennial") provided construction financing for the Project.  The United States Department of Housing and Urban Development ("HUD") insured the mortgage.  After GHHLP defaulted on the loan, C.D. Barnes filed an action in the Ottawa County Circuit Court alleging various state law claims, including a claim for foreclosure of its construction lien.  On November 2, 2004, C.D. Barnes filed a Second Amended Complaint naming Alphonso Jackson (the "Secretary" or HUD), the Acting Secretary of HUD, as a defendant after Centennial assigned the note and mortgage to HUD.  The Secretary removed the case to this Court pursuant to 28 U.S.C. § 1442(a).  HUD eventually foreclosed on the mortgage and deposited the foreclosure proceeds, in the approximate amount of $9.1 million, with the Clerk of the Court.

Pursuant to the initial Case Management Order issued on July 25, 2005, the Secretary has filed a motion in which it requests: (1) that the Court apply the federal first-in-time rule, grant him summary judgment with respect to C.D. Barnes' foreclosure claim and various other parties' foreclosure cross-claims, and direct the Clerk to release the foreclosure proceeds to HUD; and (2) dismiss C.D. Barnes' remaining claims for lack of subject matter jurisdiction or, in the alternative, transfer all of those claims, except for the misrepresentation claim, to the Court of Federal Claims. C.D. Barnes and Defendant/Cross, Counter, and Third Party Plaintiff Stock Building Supply, LLC ("Stock") have filed briefs opposing HUD's motion, and various other parties have filed briefs concurring in C.D. Barnes' and/or Stock's responses.[1]    For the reasons set forth below, the Court

---

[1]Those parties include Brinks Multi-Family Drywall, LLC, Pylman Power, Inc., Standale Lumber & Home Center Interiors, Precise Plumbing & Excavating, Inc. and Whirlpool Corporation.  Most of these parties have limited their concurrence to the issue of whether lien priority is governed by state or federal law.  Defendant/Cross, Counter, and Third Party Plaintiff Armstrong Wood Products has also filed a response limited to the issue of its entitlement to attorney fees under the Michigan Construction Lien Act.

will grant summary judgment to the Secretary with regard to the foreclosure claim and cross-claims but, with the exception of the misrepresentation claim against the Secretary, will deny the Secretary's motion to dismiss the remaining claims for lack of subject matter jurisdiction and his request for an order directing the Clerk to disburse the foreclosure proceeds to the Secretary.

## I.  Facts and Procedural History

GHHLP is a limited partnership formed specifically for the purpose of owning and developing the Project.  QTC Company is the current general partner, and M.J. Benzer Company was the former general partner of GHHLP.  The limited partners include, among others, Richard George, Carey Boote, and C.D. Barnes.  The Project consists of a 190-unit luxury apartment complex located on an 18-acre site in Grand Haven Township.

In early 2002, GHHLP sought construction financing through Centennial, a mortgage lender. GHHLP worked with Centennial to obtain mortgage insurance on the loan from HUD under Section 221(d)(4) of the National Housing Act, 12 U.S.C. § 1715*l*(d)(4) ("Section 221(d)(4)").  The purpose of that program is "to assist private industry in providing housing for low and moderate income families and displaced families." 12 U.S.C. § 1715*l*(a).  The program provides for a private lender to extend permanent financing for construction of a housing project, and the Secretary insures the mortgage and agrees to buy it out in the event of a default.  See 12 U.S.C. §§ 1751*l*(b) and (g); Indus. Indem., Inc. v. Landrieu, 615 F.2d 644, 645 (5th Cir. 1980) (per curiam).  Mortgage insurance is funded from the General Insurance Fund ("GIF"), which is financed in part through mortgage insurance premiums, appraisal fees, and other fees.  See 12 U.S.C. § 1735*c*(d).  Unlike some other HUD programs, the § 221(d)(4) program is available to private, for-profit mortgagors and is not restricted to low and moderate-income persons.  To minimize its risk of default and to ensure that the loan does not exceed the value of the property, HUD exercises a significant degree of control over

3

the lending relationship between the mortgagor and the mortgagee. For example, HUD analyzes the economic viability of the particular construction project based upon market demand prior to issuing a commitment; requires the mortgagor and mortgagee to enter into various agreements specifying the terms and conditions for disbursement of the construction funds, as well as the terms, conditions, and standards for operating the project, see 24 C.F.R. §§ 200.50, 200.105(a); inspects the project at various stages during construction to ensure that the work for which payment requests are made has been performed; requires the general contractor to provide adequate assurance of completion of the work and payment of subcontractors and suppliers, such as corporate performance and payment bonds; and prevents the filing of liens against the property by requiring covenants and restrictions in the mortgage and the construction contract against the creation of liens by the mortgagor or the filing of liens by the general contractor or subcontractor, see 200 C.F.R. § 200.85.

HUD eventually issued a commitment to insure the construction loan on the Project in the amount of $14.8 million under the Section 221(d)(4) program.[2] GHHLP and Centennial entered into the various loan documents, and Centennial recorded the mortgage in the Ottawa County Register of Deeds on October 18, 2002. At or about the same time, GHHLP and C.D. Barnes entered into a construction contract, pursuant to which C.D. Barnes posted a payment bond to ensure that subcontractors and suppliers would be paid for the work they performed and the materials they purchased.

In early March 2004, when the Project was approximately 70% complete, GHHLP defaulted on the mortgage note by failing to pay required interest payments. The default occurred when

---

[2] The loan was processed and approved pursuant to HUD's "Mortgage Accelerated Processing" subprogram, under which approved lenders such as Centennial prepare all of the financing application and contract documents and perform the underwriting required to approve the project. The application remains subject to HUD's approval.

GHHLP failed to obtain funding for a change order for work that deviated from the original plan. Prior to that time, C.D. Barnes' requests for payment had been paid on a timely basis. As of the default, Centennial had advanced approximately $10 million under the mortgage loan. Shortly after the default, C.D. Barnes and several of the subcontractors and suppliers filed construction liens on the Project.

On May 13, 2004, C.D. Barnes filed a complaint in the Ottawa County Circuit Court to foreclose its construction lien. On October 22, 2004, Centennial assigned the mortgage to HUD and filed an insurance claim seeking payment of $10 million. HUD paid the claim, and on or about November 8, 2004, became the mortgagee-in-possession. Thereafter, HUD made arrangements to conduct a nonjudicial foreclosure on the Project under the Multifamily Mortgage Foreclosure Act, 12 U.S.C. §§ 3701-17 ("MMFA"). On or about November 23, 2004, C.D. Barnes served a Second Amended Complaint on the Secretary, which set forth the following claims pertaining to HUD: foreclosure of construction lien (Count I); equitable lien/constructive trust (Count III); third party beneficiary (Count IV); unjust enrichment (Count V); quantum meruit (Count VI); promissory estoppel/equitable estoppel (Count VII); negligent and/or innocent misrepresentation (Count VIII); and quantum valebant (Count XIII). The Secretary removed the case to this Court on December 16, 2004.

After some delay caused, in part, by the efforts of two subcontractors to enjoin the sale, HUD completed the foreclosure on April 4, 2005.[3] The highest bidder purchased the Project for $9.1 million. HUD is owed a total of $10,744,916.82, consisting of the unpaid balance of the construction

---

[3]On January 7, 2005, Defendants Engineered Heating & Cooling, Inc. and Frederick's Company, Inc. filed a motion for a temporary restraining order and preliminary injunction seeking an order enjoining the sale set for January 10, 2005. Following a telephone hearing held on that same day, the Court granted the motion upon the condition that Defendants post a bond in the amount of $50,000. After Defendants failed to post the required bond, the Court entered an Order on January 21, 2005, denying the motion and permitting HUD to proceed with the foreclosure sale.

loan and additional costs relating to the loan and the foreclosure.  Pursuant to § 3712 of the MMFA, HUD deposited the foreclosure proceeds into a registry account with the Court pending the Court's determination of the proper disposition of the funds.

## II.  Discussion

The Secretary raises several issues in his instant motion.  First, the Secretary argues that he is entitled to summary judgment with respect to the foreclosure claim in Count I of C.D. Barnes' Second Amended Complaint and with respect to the foreclosure counts in the cross-claims asserted by the following subcontractors and suppliers: Fredericks Company, Inc., Engineered Heating & Cooling, Inc., Stock Building Supply, LLC, Standale Lumber & Home Center Interiors, Whirlpool Corporation, Brinks Multi-Family Drywall, Inc., Pylman Power, Inc., Bond Construction Co., Precise Plumbing & Excavating, Inc., and Armstrong Wood Products, Inc.  The Secretary argues that federal law, specifically, the MMFA, applies in determining priority to the foreclosure proceeds and that under the first-in-time priority rule set forth in that statute, there is no genuine issue of material fact that HUD's mortgage was recorded first and has priority over all other claims.  Second, the Secretary argues that C.D. Barnes' negligent/innocent misrepresentation claim in Count VIII is barred by sovereign immunity because the Federal Tort Claims Act does not waive immunity for claims based upon a misrepresentation.  Finally, with regard to C.D. Barnes' claims of equitable lien/constructive trust, unjust enrichment, quantum meruit, promissory estoppel/equitable estoppel, and quantum valebant, the Secretary contends that they are barred by sovereign immunity or, in the alternative, that this Court lacks jurisdiction over those claims because they are subject to the Contract Disputes Act, 41 U.S.C. §§ 601-02 ("CDA"), and therefore must be brought in the Court of Federal Claims.

## A.      The Foreclosure Claim

As noted above, HUD conducted a non-judicial foreclosure proceeding pursuant to the MMFA.  As one court has observed:

> The MMFA was enacted to eliminate the conditions that seriously impair the Secretary's ability to protect the Federal financial interest by providing a more expeditious procedure for the Secretary's foreclosure of mortgages.  It sets out the procedure for selecting a commissioner and designating his or her duties, the prerequisites to foreclosure, and the specific notice of default that is to be given.

Guity v. Martinez, No. 03 Civ. 6266(LAP), 2004 WL 1145832, at *4 (S.D.N.Y. May 20, 2004).  With the exception of the failed attempt by two subcontractors to enjoin the sale, HUD conducted the foreclosure without objection by any party in this case.  There is no argument that the MMFA did not apply to the mortgage at issue or that the sale was improper or invalid because of some defect in notice or procedure.

The MMFA also contains a provision that provides for the disposition of foreclosure proceeds.  Sale proceeds are to be applied in the following manner:

> (1) first to cover the costs of foreclosure provided for in section 369C [12 U.S.C. § 3711];
> (2) then to pay valid tax liens or assessments prior to the mortgage;
> (3) then to pay any liens recorded prior to the recording of the mortgage which are required to be paid in conformity with the terms of sale in the notice of default and foreclosure sale;
> (4) then to service charges and advancements for taxes, assessments, and property insurance premiums;
> (5) then to the interest;
> (6) then to the principal balance secured by the mortgage (including expenditures for the necessary protection, preservation, and repair of the security property as authorized under the mortgage agreement and interest thereon if provided for in the mortgage agreement); and
> (7) then to late charges.
> Any surplus after payment of the foregoing shall be paid to holders of liens recorded after the mortgage and then to the appropriate mortgagor. . . .

12 U.S.C. § 3712.  The Secretary argues that HUD is entitled to all of the foreclosure proceedings under the MMFA's first-in-time, first-in-right priority rule because the mortgage was recorded on

October 18, 2002, and all of the construction liens filed by the subcontractors and suppliers were filed after that date. In addition, the Secretary has presented evidence showing that the amount owed to HUD, as determined under § 3712, exceeds the $9.1 million realized from the foreclosure sale, leaving no surplus to be applied to other liens recorded after the mortgage lien. (Stark Decl. ¶¶ 2, 3.)

The Supreme Court "has consistently held that federal law governs questions involving the rights of the United States arising under nationwide federal programs." United States v. Kimbell Foods, Inc., 440 U.S. 715, 726, 99 S. Ct. 1448, 1457 (1979). In this case, the federal law governing priority of claims to mortgage foreclosure proceeds is set forth in § 3712. Moreover, in accordance with that statute, HUD has promulgated a regulation governing the disposition of foreclosure proceeds which requires a federal rule of priority: "The priority of the Secretary's lien shall be determined by the Federal first-in-time first-in-right rule. State laws affording priority to liens recorded after the mortgage are preempted." 24 C.F.R. § 27.40(a). Thus, under HUD regulations, the MMFA preempts state construction lien law whenever HUD conducts a foreclosure sale pursuant to the MMFA.

In spite of the statute and regulation, C.D. Barnes and Stock argue that priority to the foreclosure proceeds must be determined by application of state law, specifically, the Michigan Construction Lien Act ("CLA"), M.C.L.A. §§ 570.1101-1305. Under the CLA, a construction lien is effective upon the "first actual physical improvement" and has priority over a mortgage that is recorded after the commencement of the construction work. See M.C.L.A. § 570.1119(3); M.D. Marinich, Inc. v. Mich. Nat'l Bank, 193 Mich. App. 447, 454, 484 N.W.2d 738, 741 (1992). Thus, the CLA would give priority to C.D. Barnes' and the other claimants' construction liens if the "first actual physical improvement," as defined in the statute, was performed before Centennial recorded the mortgage.

As support for the application of state law on lien priority, C.D. Barnes and Stock rely upon the Supreme Court's decision in Kimbell Foods, supra, and the First Circuit's decision in Chicago Title Insurance Co. v. Sherred Village Associates, 708 F.2d 804 (1st Cir. 1983). In Kimbell Foods, the issue before the Court in two consolidated cases was "whether contractual liens arising from certain federal loan programs take precedence over private liens, *in the absence of a federal statute setting priorities.*" 440 U.S. at 718, 99 S. Ct. at 1453 (italics added). At issue was the priority of a lien securing a loan guaranteed by the Small Business Administration and the priority of a lien securing a loan by the Farmers Home Administration. The Court observed that its task required it first to determine whether to apply state or federal law to resolve the controversies and then, if it determined that federal law applied, to determine whether to establish a uniform priority rule or to rely upon state commercial law to resolve the priority of the competing liens. Id. After concluding that federal law governed the priority of the federal liens, see id. at 726-72, 99 S. Ct. at 1457, the Court considered three factors in deciding whether to adopt a uniform rule or to apply state commercial law: (1) the need for a uniform body of federal law; (2) the likelihood that the disparate application of state laws would frustrate specific objectives of the federal program; and (3) the extent to which application of a federal rule would disrupt commercial relationships predicated on state law. Id. at 728-29, 99 S. Ct. at 1458-59. The Court concluded that there was no need for a uniform federal rule and that state law adequately protected both the government and private creditors without frustrating the objectives of the federal programs.

The issue in Chicago Title was whether, in light of Kimbell Foods, federal law should adopt state law to resolve a priority dispute between a mechanics lien and a mortgage insured by HUD under § 236 of the National Housing Act. A subcontractor on the project filed a mechanics lien and initiated a lawsuit in state court to enforce its lien. Subsequently, the owner defaulted on the

9

mortgage and the bank assigned the mortgage to HUD.  Before judgment was rendered in state court,

the lender and the title company that insured the title filed an action in federal court seeking a

declaration that the government's mortgage had priority over the mechanics lien (HUD was named

as a defendant although its interest was aligned with the bank and the title company).  The First

Circuit affirmed the district court's ruling that state law applied to the determination of lien priority

and that the subcontractor's lien had priority over HUD's mortgage.  The court acknowledged that

"a clear indication of congressional intent [regarding the relative priority between private contractual

liens and HUD-insured mortgages] would render *Kimbell Foods* inapplicable," 708 F.2d at 807, but

it found a lack of any such intent regarding the priority of HUD-insured mortgages.  The court first

rejected HUD's argument that it had "long assumed" that the federal rule of priority would apply,

because the statute and regulations upon which HUD relied did not specifically address priority.

> We agree that an agency's interpretation of its own regulations is entitled to considerable weight.  We also agree that, assuming that the action would be within its delegated authority, the agency could promulgate regulations requiring the "first in time" priority rule.  We are not persuaded, however, that the sum of these two propositions means that an agency may, by its interpretation of its regulations, accomplish a preemption of state law not otherwise supportable in the regulations themselves.  Absent a clearer declaration by Congress or HUD, we find the agency's assumption that a federal rule of priority was necessary to ensure its "first lien" stat[us] an insufficient indication of congressional intent to render *Kimbell Foods* inapplicable.

Id. at 808 (citation omitted).  Second, the court acknowledged that the MMFA provides for

application of the "first in time" rule when HUD conducts a foreclosure pursuant to the MMFA, but

it found no basis to conclude that Congress "express[ed] its intent that federally insured liens always

have first in time priority or any concern over the possible subordination of a federal lien to a superior

mechanics' lien."  Id. at 809.  While the court conceded that applying the "first in time" rule of

priority only in situations in which HUD conducted an MMFA foreclosure would appear to create

a double standard of priority depending upon which party enforced its lien first, it declined to apply the federal rule of priority because there was no "specific congressional direction" to do so in the absence of an MMFA foreclosure by HUD.  Id.  Therefore, the court analyzed the Kimbell Foods considerations and concluded that state law should apply to determine priority among the competing liens.

Neither Kimbell Foods nor Chicago Title requires or permits this Court to apply anything other than the federal "first in time" rule in this case.  Beyond requiring the application of federal law to resolve the priority issue in this case, Kimbell Foods is not instructive because in the instant case, there is a federal statute, as well as a HUD regulation, governing priorities in a foreclosure under the MMFA.  See Wachovia Bank, N.A. v. Watters, __ F.3d __, No. 04-2257, 2005 WL 3453909, at *3 (6th Cir. Dec. 19, 2005) (explaining that conflict preemption arises where state law stands as an obstacle to the purposes of federal law and that in such a case, the only issue is whether the agency has exceeded its statutory authority in enacting the regulation).  This Court is not faced with a situation in which Congress has not spoken with regard to the applicable rule of priority.  Thus, this Court need not consider the Kimbell Foods factors.  Similarly, Chicago Title differs from this case because HUD did not initiate foreclosure proceedings under the MMFA in Chicago Title, whereas in this case, HUD conducted an MMFA foreclosure.  See id. at 809 n.4.  As the First Circuit recognized, the "first in time" rule applies when HUD initiates an MMFA foreclosure.  See id. at 808. In addition, this case involves a HUD regulation adopted after the Chicago Title decision,[4] which provides not only that the federal "first in time" priority rule applies in these circumstances, but also that "State laws affording priority to liens recorded after the mortgage are preempted."  24 C.F.R. §

---

[4]See 61 Fed. Reg. 48,546 (Sept. 13, 1996) (Multifamily and Single Family Nonjudicial Foreclosure Procedures Streamlining).

27.40(a).  A regulation such as this purporting to preempt state law is valid, regardless of whether Congress has authorized the agency to preempt state law, so long as Congress has authorized the agency to enact such regulations.  See City of New York v. FCC, 486 U.S. 57, 64, 108 S. Ct. 1637, 1642 (1988).  Stock's assertion that the regulation is beyond the Secretary's authority is wrong.  The MMFA specifically  provides that "[t]he Secretary is authorized to issue such regulations as may be necessary to carry out the provisions of this part."  12 U.S.C. § 3717.  Because the regulation is aimed at implementing the priority scheme of the MMFA, it is a valid exercise of the grant of authority to the Secretary.[5]

C.D. Barnes contends that, even if the federal rule of priority applies, its construction lien is first in time based upon principles of "choateness."  The Court rejects this argument.  Assuming that the principal of "choateness" could apply in this situation, where HUD has priority by virtue of the mortgage interest it received by assignment from Centennial, C.D. Barnes has not met the requirements for its lien to be "choate."  For a non-federal lien to be "choate" under the federal common law rule governing priority of liens, the identity of the lienor, the property subject to the lien, and the amount of the lien must be established.  See Willow Creek Lumber Co. v. Porter County Plumbing & Heating, Inc., 572 F.2d 588, 590 (7th Cir. 1978).  This means that "mechanics' liens must be reduced to judgment."  See id.; W.T. Jones & Co. v. Foodco Realty, Inc., 318 F.2d 881, 887 (4th Cir. 1963) (noting that "recent decisions [of the Supreme Court] leave little room for doubt that

---

[5]At oral argument, Stock's counsel presented an argument based upon 12 U.S.C. § 3713(c), which provides, in part:  "A purchaser at a foreclosure sale held pursuant to this part shall be entitled to possession upon passage of title to the mortgaged property, subject to an interest or interests senior to that of the mortgage . . . ."  Stock's argument, as the Court understands it, is that this section recognizes that C.D. Barnes' and the subcontractors' liens are senior to the mortgage and that the Project remains subject to those liens following the foreclosure sale.  Stock's counsel also asserted that those liens do not transfer to the proceeds of the foreclosure sale.  The Court disagrees with Stock that § 3713(c) has anything to do with the determination of whether construction liens are senior to the mortgage.  Moreover, the argument is confusing, because if Stock and the other construction lien claimants have no interest in the foreclosure proceeds, they would have no standing to dispute the issue of priority to the proceeds.

the interim steps of filing and recoding the lien, without obtaining a final judgment enforcing the lien against the property, serves 'merely as a caveat of a more perfect lien to come.'") (quoting New York v. Maclay, 288 U.S. 290, 294, 53 S. Ct. 323, 324 (1933)).[6]  Thus, under the MMFA, the mortgage, which was first in time, has priority over the later-filed liens.

### B.    C.D. Barnes' Remaining Claims Against The Secretary

The Secretary also argues that C.D. Barnes' remaining claims are barred by sovereign immunity.  The doctrine of sovereign immunity serves as an absolute bar to an action against the government.  See Dalehite v. United States, 346 U.S. 15, 30, 73 S. Ct. 956, 965 (1953).  "It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." United States v. Mitchell, 463 U.S. 206, 212, 103 S. Ct. 2961, 2965 (1983).  This "jurisdictional bar operates when a suit threatens to impose upon the United States liability for money or property damages or some form of coercive injunctive relief."  United States v. Rural Elec. Convenience Coop. Co., 922 F.2d 429, 434 (7th Cir. 1991).  Any waiver of sovereign immunity must be clear, express, and unambiguous.  See United States v. Ryan, 985 F.2d 1320, 1325 (6th Cir. 1993) (quoting Ohio v. United States Dep't of Energy, 904 F.2d 1058, 1059 (6th Cir. 1990), rev'd on other grounds, 503 U.S. 607, 112 S. Ct. 1627 (1992)).

### 1.    The Misrepresentation Claim

---

[6]Pursuant to the construction contract between GHHLP and C.D. Barnes, C.D. Barnes agreed that it would not file a mechanic's or a materialman's lien against the property.  (Construction Contract, Second Am. Compl. Ex. 2, Art. 7.)  C.D. Barnes contends that any waiver of lien is invalid under the CLA.  See M.C.L.A. § 570.1115(1) ("A person shall not require, as part of any contract for an improvement, that the right to a construction lien be waived in advance of work performed.  A waiver obtained as part of a contract for an improvement is contrary to public policy, and shall be invalid, except to the extent that payment for labor and material furnished was actually made to the person giving the waiver.").  However, as the Secretary notes, the contract in this case required the posting of a payment bond to protect subcontractors in lieu of asserting lien rights.  Thus, the Project was similar to a public project which, under Michigan law, requires a waiver of lien rights but protects laborers and material suppliers by requiring performance and payment bonds.  See Kammer Asphalt Paving Co. v. East China Twp. Schs., 443 Mich. 176, 504 N.W.2d 635 (1993).

The Secretary argues that the negligent and/or innocent misrepresentation claim in Count VIII must be dismissed because tort claims against the United States that are based upon misrepresentation are excluded from the waiver of sovereign immunity under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 to 2680.  "Any claim arising out of . . . misrepresentation" is expressly excepted from the limited waiver of immunity under the FTCA.  28 U.S.C. § 2680(h); see also United States v. Baden Plaza Assocs., 826 F. Supp. 294, 298-99 (E.D. Mo. 1993) (holding that the defendants' counterclaim based upon HUD's misrepresentation concerning the availability of Section 8 certificates was barred under 28 U.S.C. § 2860(h)).  C.D. Barnes concedes that the Court lacks jurisdiction over the claim to the extent that it is asserted against HUD but states that it "does not concede dismissal of this claim to the extent HUD 'stands in the shoes' of Centennial and assumes the responsibilities of Centennial."  (Pl.'s Resp. Br. at 3 n.1.)  C.D. Barnes fails to cite any authority for the proposition that it may maintain a claim against HUD based upon misrepresentations by others, and the Court is not aware of any authority to support this rather novel proposition. Therefore, the Court will dismiss this claim against HUD.

### 2. The Third Party Beneficiary and Equitable Claims

With regard to C.D. Barnes' remaining claims for equitable lien/constructive trust, unjust enrichment, quantum meruit, promissory estoppel/equitable estoppel, and quantum valebant, the Secretary argues that the claims are contractual in nature and the Secretary has not waived sovereign immunity with respect to such claims.  C.D. Barnes contends that HUD is wrong.  It argues that the applicable waiver is found in Section 1702 of the National Housing Act, which provides, in part: "The Secretary shall, in carrying out the provisions of this title and titles II, III, V, VI, VII, VIII, IX, and XI be authorized, in his official capacity, to sue and be sued in any court of competent jurisdiction, State or Federal."  12 U.S.C. § 1702.  Courts have held that sue and be sued clauses, such

14

as the one at issue in this case, waive immunity for suits against agencies that engage in commercial-type transactions with the public.  See Far W. Fed. Bank, S.B. v. Office of Thrift Supervision, 930 F.2d 883, 888 (Fed. Cir. 1991) ("The large number of statutes that contain 'sue and be sued' clauses reflects congressional intention that judicial remedy not be withheld when governmental agencies enter into transactions with the public."); Falls Riverway Realty Inc. v. Niagara Falls, 754 F.2d 49, 55 (2d Cir. 1985) (noting that "'sue and be sued' waivers . . . apply only to suits against the specific entity whose immunity was waived and have no application to suits against the United States generally").  The Secretary responds that even if the "sue and be sued" provision waives sovereign immunity, C.D. Barnes' claims are subject to the Contract Disputes Act ("CDA"), and this Court lacks jurisdiction over those claims because the CDA vests exclusive jurisdiction in the Court of Federal Claims.[7]

<b>a.     The CDA Does Not Apply To C.D. Barnes' Claims</b>

As mentioned above, the Secretary argues that regardless of whether there is a valid waiver under Section 1702, this Court lacks jurisdiction over C.D. Barnes' claims because they are subject to the CDA.  The Court disagrees.  The CDA provides the exclusive avenue for resolving contract claims against the United States.  See A & S Council Oil Co. v. Lader, 56 F.3d 234, 236 (D.C. Cir.

---

[7]In their respective briefs, the Secretary and, to a greater extent, C.D. Barnes, both address the viability of C.D. Barnes' third party beneficiary and equitable claims (promissory estoppel, unjust enrichment, quantum meruit/quantum valebant) in a case such as this involving a Section 221(d)(4) project.  As C.D. Barnes notes, and the Secretary acknowledges, several courts have allowed contractors to maintain such claims against HUD in the context of Section 236 housing projects.  See S.S. Silberblatt, Inc. v. E. Harlem Pilot Block, 608 F.2d 28, 37-41 (2d Cir. 1979); Spring Constr. Co. v. Harris, 562 F.2d 933, 935-37 (4th Cir. 1977); Trans-Bay Eng'rs & Builders, Inc. v. Hills, 551 F.2d 370, 381 (D.C. Cir. 1976).  In Van-Tex, Inc. v. Pierce, 703 F.2d 891 (5th Cir. 1983), the Fifth Circuit declined to recognize equitable remedies for recovery of retention amounts from HUD in a Section 221(d)(4) project.  The court distinguished cases allowing such remedies for Section 236 projects largely on the basis that a Section 236 owner possesses no assets other than the property from which the contractor may seek payment, while an owner in a Section 221(d)(4) project has other assets from which the contractor may seek payment.  Id. at 896-97.  Although the parties argue about whether Van-Tex or the Trans-Bay line of cases should apply in this case, the Court will not address that issue because the instant motion specifically addresses this Court's jurisdiction over C.D. Barnes' claims and not the viability of those claims.

1995).  Its purpose is "to provide a comprehensive system for the adjudication of contract claims

against the government."  Ingersoll-Rand Co. v. United States, 780 F.2d 74, 78 (D.C. Cir. 1985).

Such claims are subject to administrative review by the agency's contracting officer.  See 41 U.S.C.

§ 605(a).  Review of administrative decisions may be had either through an appeal to the agency's

board of contract appeals or through an action in the United States Court of Federal Claims.  See 41

U.S.C. §§ 606, 609(a)(1).  Although the CDA governs contracts to which the United States is a party,

it is limited in scope to certain contracts:

> **(a) Executive Agency contracts.**  Unless otherwise specifically provided herein, this
> Act applies to any express or implied contract (including those of the nonappropriated
> fund activities described in sections 1346 and 1491 of title 28, United States Code)
> entered into by an executive agency for –
>> (1) the procurement of property, other than real property in being;
>> (2) the procurement of services;
>> (3) the procurement of construction, alteration, repair or maintenance of real property;
>> or,
>> (4) the disposal of personal property.

41 U.S.C.  § 602(a)(3).  An "executive agency" includes "an executive department as defined in

section 101 of title 5, United States Code," 41 U.S.C. § 601(2), which specifically includes HUD.

See 5 U.S.C. § 101.  A "contractor" means "a party to a Government contract other than the

Government."  41 U.S.C. § 601(4).

In arguing that the CDA applies to C.D. Barnes' claims, the Secretary improperly focuses

upon the label, rather than the substance, of the claims at issue.  For example, the Secretary points

out that C.D. Barnes alleges that it is a third-party beneficiary of the Building Loan Agreement

between GHHLP and Centennial.  The Secretary then notes that some courts have acknowledged that

the CDA applies to claims by those who are third-party beneficiaries of contracts between contractors

and the government.  However, as the Fourth Circuit recently noted, the CDA covers procurement

contracts and "applies *only* to claims by the Government against a contractor or by a contractor

16

against the Government." <u>United Kingdom Ministry of Defence v. Trimble Navigation Ltd.</u>, 422 F.3d 165, 169 (4th Cir. 2005). C.D. Barnes' third party beneficiary claim is premised upon its allegation that it was a third party beneficiary of the loan agreement between GHHLP and Centennial (and HUD as assignee of that agreement). (2d Am. Compl. ¶ 44.) The loan agreement was not a procurement contract covered by the CDA. In <u>Reece v. Cisneros</u>, No. 95-1140, 1995 WL 376184 (Fed. Cir. June 8, 1995), the Federal Circuit stated:

> The loan agreement in this case is not a contract for the direct procurement of property or services by the United States. Procurement contracts are typified by buyer-seller relationship. *Pasteur v. United States*, 814 F.2d 624, 627-28 (Fed. Cit. 1987). Here, there was no such relationship because there was an assignment of the loan to the United States. *See G.E. Boggs & Assocs., Inc. v. Roskens*, 969 F.2d 1023, 1027-28 (Fed. Cir. 1992). Moreover, the purpose of the national housing program is to promote the making of loans, thereby encouraging the construction and sale of private housing. Thus, the arrangement between the United States, as guarantor, and [the lender] was not for the benefit of the federal government and did not involve a government contract for the procurement of property or services.

<u>Id.</u> at *1. <u>See also</u> <u>Blake v. Kemp</u>, No. 92-1339, 1992 WL 276651, at *2 (Fed. Cir. Aug. 25, 1992) ("Assuming without deciding that Blake has contractual privity with the government based on his assigned loan agreement, Blake's contract with HUD falls well outside the scope of the Contract Disputes Act. The United States was not a party to the original loan agreement. . . . [T]he United States merely acted in furtherance of a longstanding government policy designed to encourage lending for the rehabilitation of private housing, and therefore did not benefit directly from the loan agreement.").

The Secretary further argues that C.D. Barnes' remaining claims are subject to the CDA because they are essentially contractual in nature. Regarding the characterization of claims for purposes of the CDA, the Sixth Circuit has recently observed:

> The CDA bars district court jurisdiction if the court determines that a plaintiff's claims against a government agency are "essentially contractual" in nature. *RMI*

*Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1136 (6th Cir. 1996). "'The classification of a particular action as one which is or is not [essential contractual] depends both on the source of the rights upon which the plaintiff basis its claim, and upon the type of relief sought (or appropriate).'" *Id.* (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). "The plaintiff's title or characterization of its claims is not controlling. '[A] plaintiff may not avoid the jurisdictional bar of the CDA merely by alleging violations of regulatory or statutory provisions.'" *Id.* (alteration in original) (quoting *Ingersol-Rand Co. v. United States*, 780 F.2d 74, 77 (D.C. Cir. 1985)).

B & B Trucking, Inc. v. United States Postal Serv., 406 F.3d 766, 768 (6th Cir. 2005) (en banc).

In support of his argument that C.D. Barnes' equitable claims fall within the CDA, the Secretary relies upon Campanella v. Commerce Exchange Bank, 137 F.3d 885 (6th Cir. 1998). The plaintiff in Campanella sold equipment to the debtor and, in connection with the sale, received a security interest in the equipment that was junior to the lien of a bank that had provided a business loan to the debtor. The bank's loan was guaranteed by the Small Business Administration ("SBA"). At the time of the asset sale, the debtor leased the premises from the plaintiff in which the business was located. The debtor eventually defaulted on the loan to the bank and, shortly thereafter, notified the plaintiff that it was moving the business and assets to another location. After the plaintiff and the debtor conducted a walkthrough of the premises, however, the debtor advised the plaintiff that several pieces of equipment would be left behind. After that time, the plaintiff worked with representatives of the bank and the SBA to sell the equipment, which remained on the plaintiff's premises and under his exclusive control. The SBA eventually sold the equipment for $5,655. About a month after the sale, the plaintiff wrote to the bank and the SBA claiming that he was due a total of $26,100 for rent and brokerage services. The plaintiff filed suit against the bank and the SBA alleging six claims, including two straight contract claims, one quantum meruit (unjust enrichment) claim, and three tort claims. The district court dismissed the contract claims as preempted by the CDA but concluded that the CDA did not apply to the quantum meruit claim. In a subsequent opinion, the district court

18

granted the defendants' motion for summary judgment on the quantum meruit claim and the tort claims on various grounds.  On appeal, the Sixth Circuit held that the district court correctly dismissed the contract claims as barred by the CDA, but it also concluded that the quantum meruit claim was barred by the CDA because it was essentially a contract claim.  The court observed: "The allegations in this count are virtually identical to those in the straight contractual counts, and it makes no sense that the latter would be barred by the CDA but the former could proceed."  Id. at 892.

The Court finds Campanella distinguishable from the instant case.  In Campanella, the plaintiff alleged that it was entitled to rent charges and fees for brokerage services that were rendered to or for the benefit of the SBA.  Such allegations were sufficient to invoke the CDA because the alleged oral contracts were between the SBA and the plaintiff for the procurement of services (storage of the equipment and brokerage services).  The plaintiff's quantum meruit claim was simply a restatement of the contract claims and, as the court noted, it would make no sense to allow the quantum meruit claim to proceed but dismiss the contract claims as barred by the CDA.  In contrast, in this case, as already noted above, C.D. Barnes' third party beneficiary claim is based on a contract that falls outside of the CDA because it was not a procurement contract.  Similarly, C.D. Barnes' equitable claims are based upon HUD's status as insurer/assignee of the loan agreement and not upon HUD's status as purchaser of goods or services.  Those claims are not simply CDA claims recast in tort language merely to avoid the jurisdictional bar of the CDA.  Rather, the claims essentially hinge upon HUD's failure and/or refusal to disburse funds under the loan agreement for work that C.D. Barnes performed on the Project.  (2d Am. Compl. ¶ 41 ("The undistributed mortgage proceeds are subject to attachment as an equitable lien and/or constructive trust for the benefit of C.D. Barnes on behalf of itself and its subcontractors for payment of amounts due on the contract and for damages for GHHLP's failure to make timely payments."); ¶ 51 ("Justice requires that C.D. Barnes be

compensated by requiring disbursal of the loan proceeds, including accumulated retention, now held by HUD and/or Centennial but originally intended to be paid to C.D. Barnes upon completion of construction.").)  Accordingly, the CDA is not applicable to C.D. Barnes' claims.

> **b.**  **The "Sue And Be Sued" Clause In Section 1702 Constitutes A Waiver Of Sovereign Immunity For C.D. Barnes' Claims Against The Secretary**

The issue of whether a "sue and be sued" clause waives sovereign immunity in suits against a particular agency has received substantial attention in the context of suits against HUD.  In general, courts have held that Section 1 of the National Housing Act, 12 U.S.C. § 1702, constitutes a waiver of sovereign immunity in suits against HUD or the Secretary for actions taken in carrying out the purposes of the National Housing Act.  See Trans -Bay Engineers & Builders, Inc. v. Hills, 551 F.2d 370, 376 (D.C. Cir. 1976); S.S. Silberblatt, Inc. v. E. Harlem Pilot Block, 608 F.2d 28, 36 (2d Cir. 1979); Bor-Son Bldg. Corp. v. Heller, 572 F.2d 174, 179-80 (8th Cir. 1978); Bennett Constr. Co. v. Allen Gardens, Inc., 433 F. Supp. 825, 831 (W.D. Mo. 1977).  On the other hand, many courts have recognized the following limitation on the scope of the waiver:

> For . . . [a] claim to be against the Secretary, and therefore within the scope of the "sue and be sued" clause, as opposed to a suit against the United States that could not be brought in federal district court, any judgment for the plaintiff must be recoverable from funds in the possession and control of the Secretary that are severed from Treasury funds and treasury control.

Industrial Indem., Inc. v. Landrieu, 615 F.2d 644, 646 (5th Cir. 1980) (per curiam);  see also S.S. Silberblatt, Inc., 608 F.2d at 36 ("For a claim to be against the Secretary, and therefore with the scope of the 'sue and be sued' clause, as opposed to a suit against the United States, any judgment for plaintiff must be out of funds in the control of the Secretary as distinguished from general Treasury funds."); Merrill Tenant Council v. United States Dep't of Hous. & Urban Dev., 638 F.2d 1086, 1091 (7th Cir.1981) ("It is true that for a claim to be against the Secretary of HUD and within the scope

of the 'sue and be sued' clause of 12 U.S.C. § 1702, a judgment for plaintiffs must come from funds within the control of the Secretary."); Marcus Garvey Square, Inc. v. Winston Burnett Constr. Co., 595 F.2d 1126, 1131 (9th Cir. 1979) (stating that "the first matter which must be resolved is whether there are funds in the possession and control of [HUD] which Burnett can point to for its recovery"); Mann v. Pierce, 803 F.2d 1552, 1557 (11th Cir. 1986) ("Section 1702 is a limited waiver of immunity and any damages sought from HUD must be payable from HUD's General Insurance Fund . . . and not from the United States Treasury.").

The agency funds/treasury funds dichotomy derives from Federal Housing Administration, Region No. 4 v. Burr, 309 U.S. 242, 60 S. Ct. 488 (1940), in which the Supreme Court held that a prior version of § 1702 applicable to the Federal Housing Administration ("FHA") permitted a judgment creditor to garnish the unpaid wages of a former FHA employee.  The Court stated that sue and be sued clauses should be "liberally construed" in light of the congressional policy to endow federal government corporations with attributes of private commercial entities.  See id. at 245, 60 S. Ct. at 490.  Thus, courts should be hesitant to limit the scope of such waivers:

> [I]t cannot be lightly assumed that restrictions on that authority are to be implied. Rather if the general authority to "sue and be sued" is to be delimited by implied exceptions, it must be clearly shown that certain types of suits are not consistent with the statutory or constitutional scheme, that an implied restriction of the general authority is necessary to avoid grave interference with the performance of a governmental function, or that for other reasons it was plainly the purpose of Congress to use the 'sue and be sued' clause in a narrow sense.  In the absence of such showing, it must be presumed that when Congress launched a governmental agency in to the commercial world and endowed it with authority to "sue or be sued," that agency is not less amenable to judicial process than a private enterprise under like circumstances would be.

Id. at 245, 60 S. Ct. at 490 (footnote omitted).  The Court held that the garnishment was permissible because it was a matter relating to the FHA Administrator's duties; the FHA was authorized under Title I, Section I of the National Housing Act to hire the employee and the employee could have

21

maintained a suit on his employment contract with the FHA, therefore, "[t]o allow respondent to

reach that claim through a writ of garnishment is therefore not to enlarge petitioner's liability nor to

add one iota to the scope of § 1." Id. at 248-49, 60 S. Ct. at 492.  Finally, the Court held that any

execution would be limited to funds provided under the National Housing Act:

> Congress has specifically directed that all such claims against the Federal Housing
> Administration of the type here involved "shall be paid out of funds made available
> by this Act [chapter]."  § 1.  Hence those funds, and only those, are subject to
> execution.  The result is that only those funds which have been paid over to the
> Federal Housing Administration in accordance with § 1 and which are in its
> possession, severed from Treasury funds and Treasury control, are subject to
> execution."

Id. at 250, 60 S. Ct. at 493.

Courts construing Burr to allow a suit against the Secretary only if the Secretary controls

funds which may be used to satisfy a judgment in favor of the plaintiff have reached different

conclusions with regard to what constitutes a fund within the Secretary's control as distinguished

from general Treasury funds.  In Industrial Indemnity, Inc., supra, the Fifth Circuit held that the

plaintiff's suit was a suit against the Secretary because any judgment in favor of the plaintiff could

be paid out of the General Insurance Fund (GIF), which was "a separate fund in the control and

possession of the Secretary."  615 F.2d at 646.  The court observed that a judgment would not affect

funds in the Treasury because it would be paid from "funds in the accounts of the government's

officer's charged with HUD's application of funds."  Id. at 646-47.  See also S.S. Silberblatt, Inc.,

608 F.2d at 36 (concluding that the Special Risk Insurance Fund ("SRIF") constituted "funds

appropriated under the National Housing Act and in the control or subject to the discretion of the

Secretary").  C.D. Barnes contends that this Court should follow Industrial Indemnity because any

judgment in this case would be payable from the separate, statutorily-created GIF.  Although the

Secretary does not dispute that a judgment would be paid from the GIF in this case, he contends that

the better view, as expressed in <u>Carlyle Gardens Co. v. Delaware State Housing Authority</u>, 659 F.

Supp. 1300 (D. Del. 1987), is that Treasury funds appropriated to HUD retain their character as

Treasury funds even though they are placed in a separate HUD fund.  The <u>Carlyle Gardens</u> court

relied largely upon <u>Portsmouth Redevelopment and Housing Authority v. Pierce</u>, 706 F.2d 471 (4th

Cir. 1983), in which the Fourth Circuit held that the plaintiff's claims against HUD were subject to

the Tucker Act because any monetary recovery would be paid out of the public treasury.  The Fourth

Circuit stated:

> There is no "separate fund" for the payment of operating subsidies within HUD's
> exclusive control, "the origin of which [is] not the public treasury."  *Southern Sog*,
> 644 F.2d at 379; *see also Lomas & Nettleton Co. v. Pierce*, 636 F.2d 971, 973-74 (5th
> Cir. 1981).  The funds appropriated to HUD for payment of operating subsidies
> clearly originate in the public treasury, and they do not cease to be public funds after
> they are appropriated.

<u>Id.</u> at 473-74.  The <u>Carlyle Gardens</u> court distinguished <u>Industrial Indemnity</u> and <u>S.S. Silberblatt</u> on

the basis that the funds at issue in the case before it were funds used to finance HUD's annual

assistance contracts with public housing authorities for Section 8 housing assistance payments, which

came from the public treasury and were put into separate accounts by regulation, once appropriated,

whereas the GIF and SRIF at issue in <u>Industrial Indemnity</u> and <u>S.S. Silberblatt</u> differed because they

received some of their funding from sources other than the public treasury and they were established

as separate funds by statute rather than by regulation.  <u>Carlyle Gardens</u>, 659 F. Supp. at 1306.  In any

event, the court observed, the courts in <u>Industrial Indemnity</u> and <u>S.S. Silberblatt</u> were just plain

wrong because they relied upon a faulty analysis of <u>Burr</u>.  The court reasoned:

> [T]he recovery in *Burr* was limited to funds used to pay an employee's wages, money
> the FHA already was obligated to pay that employee.  The judgment in *Burr* did
> nothing to enlarge the FHA's liability in any way.  It simply changed the identity of
> the person receiving the check.  Permitting a plaintiff to recover funds from the GIF,
> SRIF or ACC reserve accounts is a different matter, however.  If funds contained in
> those accounts must be used to satisfy a judgment against the Secretary, they must be

> diverted from the purposes for which they were originally appropriated.  If those purposes are to be achieved, additional public funds must be appropriated to replace those funds paid out in satisfaction of that judgment.
>
> Thus, unlike the judgment in *Burr*, the judgment in *Industrial Indemnity* and *SS Silberblatt* eventually affected the public treasury.

Id. at 1306.  According to the court, the only time there could be a truly separate fund, allowing for a suit under the sue and be sued waiver, would be where none of the monies in the fund originated in the public treasury.  See id. at 1307 n.6.

At least one court, however, has argued, quite persuasively, that the treasury funds/agency funds test that courts have melded onto the waiver provided by sue and be sued clauses in the name of Burr is both unwarranted and illogical.  See Auction Co. of Am. v. FDIC, 132 F.3d 746, 752 (D.C. Cir. 1997).  The D.C. Circuit explained that in Burr, the Court actually held that the statute at issue provided that claims against the FHA could be paid only from funds made available to the agency under the statute, which was nothing more than a recognition of the uncontroversial principle that Congress may choose to limit the terms of any waiver.  See id. at 752.  The court pointed out that later cases relying on Burr, such as the Ninth Circuit's decision in Marcus Garvey, extended it for the proposition that a suit is against an agency only if the plaintiff can point to agency funds to satisfy a potential judgment, otherwise, it is against the United States and must be brought in the Court of Federal Claims under the Tucker Act waiver.  See id.  The court said that the weakness of the principle was exposed by the Fourth Circuit's statement in Portsmouth that public funds appropriated to HUD remain public funds.  The court said that it made no sense to characterize a suit as against an agency or the United States because the test cited for that purpose (Dugan v. Rank, 372 U.S. 609, 83 S. Ct. 999 (1963)) was meant to distinguish between suits against private individuals and suits against the sovereign.

Federal agencies or instrumentalities performing federal functions *always* fall on the "sovereign" side of that fault line; that is why they possess immunity that requires waiver. To say that suits against agencies are not against the United States in that sense is simply wrong; to say that they are against the United States and not the agency is to make "sue-or-be-sued" clauses nullities. The idea that the *Dugan* test may be used to draw two different lines – the line between suits against the United States and ones against its agencies – is confused at its core and we reject it.

Id.

Assuming, for purposes of this motion, that the Court is required to determine whether the suit is against HUD or the United States as a condition of the waiver in the sue and be sued clause, the Court concludes that C.D. Barnes has shown that the Secretary has in his control a fund from which any judgment in favor of C.D. Barnes may be satisfied and which has been severed from Treasury funds, namely, the GIF. See Indus. Indem., 615 F.2d at 646. Thus, a judgment would not affect the public Treasury.[8] This Court rejects the reasoning and analysis in Carlyle Gardens and Portsmouth because, to hold that public monies appropriated to HUD or any other governmental agency can never be used to satisfy a judgment obtained by a waiver under a sue and be sued clause would render such clauses ineffectual. The fact that some of the monies within the agency fund come from the public Treasury is irrelevant to the operation of sue and be sued clauses. See Far West Fed. Bank, 930 F.3d at 890 ("Legislative recognition that additional money may have to be provided to the Resolution Fund does not insulate that Fund from liability, or restrict the waiver implemented by the 'sue and be sued' clause. . . . That some of the moneys within the FDIC's control are received from the Treasury does not convert this suit into a suit against the United States, or limit jurisdiction to the Claims Court.").

---

[8]In addition to the GIF, the Court notes that the foreclosure proceeds may constitute a fund upon which an equitable lien/constructive trust may be imposed. Because the issue is not before the Court, the Court expresses no opinion on whether such a remedy is appropriate in this case.

**C.     Viability Of The Claims**

As noted supra, n. 6, both parties devoted a portion of their briefs to discussing the merits of

C.D. Barnes' claims.  Because the Secretary's motion is limited to requesting summary judgment on

the issue of foreclosure and to seeking dismissal of the remaining claims for lack of subject matter

jurisdiction, the merits of C.D. Barnes' claims (other than for foreclosure) are not before the Court

and the Court expresses no opinion on whether C.D. Barnes should be permitted to maintain such

claims in the context of the particular loan program at issue.  Given that C.D. Barnes' claim for an

equitable lien/constructive trust still remains in this case, the Court will deny without prejudice the

Secretary's request for an order directing the Clerk to release the foreclosure proceeds to the

Secretary.

### III.  Conclusion

For the foregoing reasons, the Court will grant in part and deny in part the Secretary's motion

for summary judgment and dismissal.  The Court will grant the motion with respect to Count I of the

Second Amended Complaint for foreclosure and with respect to the various foreclosure counts filed

by the cross-claimants.  The Court will deny the motion, with the exception fo the misrepresentation

claim, with respect to the motion to dismiss for lack of subject matter jurisdiction and with respect

to the Secretary's request for release of the foreclosure proceeds.

An Order consistent with this Opinion will be entered.


Dated:  December 23, 2005                          _____/s/ Gordon J. Quist_____
                                                    GORDON J. QUIST
                                                    UNITED STATES DISTRICT JUDGE

26