UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

C.D. BARNES ASSOCIATES, INC.,

          Plaintiff/Counter-Defendant,

                                 CASE NO. 1:04-CV-850

v.

                                 HON. ROBERT J. JONKER

GRAND HAVEN HIDEAWAY
LIMITED PARTNERSHIP, et al.,

          Defendants.

_____/

## OPINION

### Introduction

This case arises out of a HUD-insured real estate project (the "Project") that failed before completion. Parties include, among others, C.D. Barnes ("Barnes"), the general contractor; the United States Department of Housing and Urban Development ("HUD"); Centennial Mortgage, Inc. ("Centennial"), a HUD-approved mortgage lender; Grand Haven Hideaway Limited Partnership ("GHHLP"), a Delaware limited partnership and the owner of the Project; Richard George and Carey Boote, two of the limited partners in GHHLP; and QTC Company ("QTC"), the eventual general partner of GHHLP.

When the Project failed, HUD, as the insurer, paid Centennial's claim of approximately $9.5 million, took possession of the Project, and sold it at foreclosure for approximately $9.1 million. Barnes asserts that at the time HUD took possession, the

Project included not only value for which GHHLP had paid through loan disbursements from Centennial, HUD's assignor, but also additional value for which it had not yet been paid.  According to Barnes, this additional value lay primarily in a 10% retainage, or holdback, which was to be paid upon the completion of the Project, and in additional work approved and undertaken but not paid for due to GHHLP's failure to meet an escrow condition HUD imposed.  Barnes seeks to recover the unpaid value from some or all of HUD, Centennial, GHHLP, QTC, Mr. George and Mr. Boote.  Each of these targets has moved for summary judgment, and Barnes has moved for partial summary judgment.

**Factual Background**

**1.     GHHLP is formed to own the Project; HUD and Grand Haven Township each approve the Project following controversy.**

The Project was conceived as a 19-building development of luxury apartments to be constructed in Grand Haven, Michigan.  GHHLP was formed to own the Project.  Initially, GHHLP had five partners: M.J. Benzer Co., the general partner, represented by Michael Benzer; and Robert DeJonge, Charles Luyendyk, Mr. George, and Mr. Boote, all limited partners.

In late 2000 or early 2001, GHHLP acquired the real estate in Grand Haven Township on which it intended to develop the Project.  GHHLP wished to develop the project through a HUD program created under Section 221(d)(4) of the National Housing Act, 12 U.S.C. § 1715l(d)(4) ("Section 221(d)(4)").  Unlike most HUD programs, Section 221(d)(4) is available to for-profit mortgagors, and developments under the program are not

restricted to low or moderate-income tenants. In administering Section 221(d)(4), HUD typically works with third-party lenders, following a protocol set forth in HUD's Multi-Family Accelerated Processing Guide (the "MAP Guide"). Such lenders are sometimes called "MAP lenders." HUD tightly controls most aspects of Section 221(d)(4) transactions, authoring the governing documents and prescribing the terms, conditions and standards for financing and for construction payments. A HUD inspector periodically visits the construction site to monitor construction progress.

The Project encountered difficulties throughout the spring and summer of 2002, well before construction began. Initially, HUD determined that the Project was not financially feasible and denied GHHLP's application to participate in the Section 221(d)(4) program. Around the same time, Grand Haven Township objected to various aspects of the Project plans. In light of HUD and Grand Haven Township's concerns, GHHLP revised its application to HUD as well as the Project plans. Changes within GHHLP also occurred around this time. Messrs. DeJonge and Luyendyk, for various reasons, each withdrew from the partnership. Barnes, which had agreed to serve as general contractor for the Project, also agreed to participate in HUD's Builder and Sponsor's Project and Risk Allowance Program ("BSPRA"). BSPRA requires an identity of interest between the Project owner and the builder; accordingly, Barnes took a 1% limited partnership interest in GHHLP.

Despite internal disagreement at HUD about the viability of the Project, HUD ultimately approved the revised application. Grand Haven Township also approved revised

Project plans.  In late July, 2002, HUD agreed to guarantee a loan of $14,822,400, to be advanced by Centennial, a MAP lender.  Consistent with Section 221(d)(4) Program conditions, HUD controlled the arrangements of the transaction.  HUD required, among other things, that: the mortgage loan be non-recourse; GHHLP be a single-asset owner; the mortgage be a first lien on the property; and that Barnes and its subcontractors waive any rights to construction liens on the property.  HUD also required GHHLP to obtain two secured letters of credit, one for $296,448, to address the costs of equipping and renting the Project to completion of construction, and the other for $343,003, for additional lease-up expenses.  Messrs. George and Boote personally guaranteed these letters of credit.

## 2.    Construction begins; unforeseen costs emerge, and delays occur.

The HUD loan closed on October 22, 2002, and construction began soon after. Payments to Barnes began to flow in accordance with the MAP process.  Under the MAP process, the MAP lender disburses the construction loan in the form of monthly advances. Owner and lender approvals precede each disbursement: the contractor submits a requisition form to the project owner, who ordinarily approves it and sends it to the lender along with a form requesting the disbursement of the loan advance to pay the contractor.  The lender normally approves these forms and disburses the advance.  In calculating the amount requested each month, the contractor subtracts a 10% retainage, or holdback, to be paid only after completion of the project and a related cost certification.  Although the contractor

4

calculates the retainage cumulatively throughout construction, no retainage funds are set aside, but rather simply are not disbursed.

As construction of the Project got underway, unforeseen challenges quickly arose. Messrs. George and Boote soon learned that, unbeknownst to them, over approximately $150,000 in architectural and engineering costs had been omitted from the Project budget submitted to and approved by HUD. Messrs. George and Boote claim that Mr. Benzer omitted these costs deliberately despite his knowledge that the partnership had insufficient funds to pay them. Also shortly after construction began, Grand Haven Township required the immediate installation of permanent access roads and underground utilities for the construction site. Barnes had not anticipated this requirement, which increased costs and delayed construction.

Costs also rose significantly due to a miscommunication concerning the Project plans. The Project plans Grand Haven Township earlier had seen featured cultured stone in the exterior of all the buildings. As the plans were revised, the cultured stone was eliminated, but the Township did not realize this. The Township had hired an outside service to review the final plans for building code compliance. Not knowing that the cultured stone was important to the Township, and viewing it simply as an aesthetic issue, the outside service approved the plans, and the Township issued a building permit. When the Township learned of the elimination of the cultured stone, it insisted that the plans be revised to reinstate it. Adding the cultured stone increased the costs of construction by at least $300,000 or more.

5

3.    **Financial worries exacerbate tensions within GHHLP; Messrs. George and Boote notify Centennial of concerns.**

Likely cost overruns increased quickly.  Meanwhile, new financial projections for the Project forecasted a darker future than originally anticipated.  Early in the summer of 2003, John Drozer, the president of Barnes, met with Messrs. Benzer, George and Boote to discuss the Project's cost overruns.  The meeting was inconclusive.  Tension among the partners in GHHLP intensified.  In May, 2003, Mr. George met with Centennial to seek its assistance in addressing growing financial worries.  He contacted Matt Kane, president of Centennial, again in June 2003, expressing concern that GHHLP might default on its loan unless more capital became available.  Mr. Kane indicated to Messrs. George and Boote that he would inform HUD of GHHLP's financial difficulties, but he did not actually do so for several months.

In June, 2003, Mr. Benzer tendered his resignation as general partner of GHHLP. However, Messrs. George and Boote elected not to accept his resignation.  Rather, they volunteered to take on some of the responsibilities Mr. Benzer had been performing. Mr. Boote began to serve as the primary liaison with Barnes and the project manager. Mr. George assumed responsibility for paying bills.  Barnes's monthly draw requests continued to go to Mr. Benzer for his review, then on to Mr. George for signature.  The HUD transaction documents prohibited changing the general partner without HUD's prior approval.  Although Mr. Benzer claimed that he had resigned as general partner in June of

2003, HUD did not approve his resignation, nor did Messrs. George and Boote accept it at that time.

Cost overruns and change orders continued to concern the GHHLP partners and Barnes, and they continued to discuss without resolving these issues.  On September 5, 2003, Barnes requested that GHHLP place in escrow sufficient funds to cover the cost overruns, but eventually withdrew its request and continued working on the Project.

**4.  HUD learns of the Project's struggles; October and November meetings are inconclusive.**

A progress and draw meeting took place at the Project site on October 30, 2003. John Straatsma, who directs HUD's Grand Rapids Multifamily Housing team, attended this meeting.  Afterward, he notified his supervisor, Robert Brown, HUD's Michigan HUB director, that the Project faced cost overruns totaling approximately $700,000 and could involve further delays.  Concerned about the Project's status, Centennial and HUD invited all parties associated with the Project to meet on November 18, 2003, at the Project site.  At this meeting, HUD was surprised to learn of Mr. George's worry that the Project might not be viable long-term.  HUD, Centennial, and Messrs. Benzer, Boote and George later excused Barnes and continued the meeting.  The owners shared with HUD and Centennial revised rental projections reflecting a negative cash flow for the Project.  There was some disagreement about the reliability of the projections, but all agreed that the Project was in trouble.  The owners indicated to HUD that they were seeking additional equity through new investors or through a sale of the Project.

**5.      The situation worsens; Barnes contemplates stopping work; March discussions fail to resolve the problems; and changes in the limited partnership occur.**

Over the next few months, the owners of the Project, with assistance from Centennial, diligently sought new investors or a buyer for the Project.  Messrs. George and Boote also inquired about increasing the mortgage or using the letters of credit to help fund the cost overruns.  At the same time, many of the cost overruns converted to change orders, which HUD, Centennial and GHHLP processed.  This group of change orders totaled approximately $231,000.  HUD refused to allow disbursements for these change orders unless GHHLP placed in escrow the same amount.  Although HUD had not raised the issue before, it noted that the transaction documents required that the loan be kept in balance, with sufficient funds to complete the Project always available.  HUD also refused to allow the parties to use the letters of credit to fund the change orders.

On March 26, 2004, Barnes requested payment of its February draw, noting that it might have to cease work on the Project in the absence of payment.  Mr. Straatsma and Mr. Kane called Mr. Drozer on March 29, 2004.  Seeking to keep Barnes from stopping work on the Project, Mr. Straatsma told Mr. Drozer that HUD was  trying to find a way to pay Barnes.  Mr. Drozer understood Mr. Straatsma to be saying that HUD would assure that Barnes was paid.  Mr. Drozer does not recall any specific comments from Mr. Kane, but he interpreted Mr. Kane's silence as agreement with Mr. Straatsma.

 In light of the Project's continued struggles and discouraging financial projections, Mr. George finally determined to abandon his interest in the Project.  On March 30, 2008,

GHHLP approved Mr. George's abandonment of his partnership interest. At the same time, GHHLP approved the resignation of M.J. Benzer Co. as general partner, and the admission of QTC Company, a company Mr. Boote had created for this purpose, as successor general partner.

**6.  Centennial declares GHHLP in default; HUD accepts assignment of mortgage and sells the Project in foreclosure.**

Also in late March, 2004, Mr. Drozer notified GHHLP that Barnes would stop work on the Project unless GHHLP arranged funding for approved change orders and monthly draw requests. On April 9, 2004, Centennial formally declared GHHLP in default, citing the partnership's failure to pay the March interest on the loan and its failure to obtain HUD's approval of the replacement of the general partner. Mr. Straatsma and Centennial continued to try to find a way to keep the Project afloat. But on April 20, 2004, Mr. Straatsma advised Mr. Drozer that the Project was in default and that Barnes should cease its work and spending on the Project. Barnes did, though, spend approximately $122,000 in suspending work, cleaning up, taking inventory and securing the Project.

On June 25, 2004, Centennial assigned the mortgage to HUD. Before assigning the mortgage, at HUD's instruction, Centennial applied the balance of GHHLP's letters of credit, totaling $586,821.33, to the outstanding loan amount. Only after that did Centennial then file its insurance claim with HUD. On October 22, 2004, HUD accepted the assignment of the mortgage and paid Centennial the amount outstanding. HUD foreclosed on the Project and sold it for approximately $9.1 million.

Barnes claims that at the time of the foreclosure sale, the Project included at least $2.2 million in embedded uncompensated value contributed by Barnes and its subcontractors. Of course, the actual amount of such value, if any, is a disputed question of fact.

### Procedural Background

Barnes filed this lawsuit late in November, 2004, in state court, and in December, 2004, HUD removed the case to federal court.   On December 23, 2005, Judge Quist issued an opinion granting in part and denying in part a series of dispositive motions in the case. His opinion held, among other things, that the Multifamily Mortgage Foreclosure Act, 12 U.S.C. §§ 37.01-17 preempts state construction lien law in this case and that HUD, as the holder of the mortgage, which was first in time, has a statutory priority to foreclosure proceeds.   But Judge Quist suspended distribution of the proceeds pending evaluation of Barnes's equitable claims. Barnes filed a Fourth Amended Complaint in June, 2006.   In August, 2007, the case was reassigned to me.

Parties in the case have filed a series of dispositive motions, outlined in the following chart:

| Count of the Complaint | HUD | Centennial | GHHLP | GP[1] (General Partners) | Boote | George |
|---|---|---|---|---|---|---|
| **Count 1** <br> Foreclosure of Construction Lien | [------------ ------------ Resolved by earlier Opinion ---------] | | | | | |
| **Count 2** <br> Breach of Contract | [------------ ------ N/A -----------] | | No Motions Pending | [------------- – N/A -- ---------] | | |
| **Count 3** <br> Equitable Lien / Constructive Trust | [--------- Cross Motions Pending -----------] | | | [------------- – N/A -- ---------] | | |
| **Count 4** <br> Third-Party Beneficiary | [---- Cross Motions Pending---] | | [----------- ---- N/A -- ---------- ---------] | | | |
| **Count 5** <br> Unjust enrichment | [------------ Cross Motions Pending --------] | | | [------------- N/A --- ---------] | | |
| **Count 6** <br> Quantum Meruit | [------------ Cross Motions Pending -----------] | | | [------------- N/A --- ---------] | | |
| **Count 7** <br> Promissory Estoppel / Equitable Estoppel | [------------ Cross Motions Pending -----------] | | | [------------- N/A --- ---------] | | |
| **Count 8** <br> Negligent and/or Innocent Misrepresentation | Dismissed by earlier opinion | [--- Cross Motions Pending -----------] | | [------------- N/A --- ---------] | | |
| **Count 9** <br> Liability of Limited Partners | [------------ --------- N/A ------- ----------- -------------] | | | | SJ Motion Pending | SJ Motion Pending |
| **Count 10** <br> Breach of Fiduciary Duty by General Partners | [------------ ---------- N/A ------- ----------] | | | [------------- | SJ Motion Pending | ---------] |

---

[1] M.J. Benzer Company was the general partner from the limited partnership's inception until March 30, 2004, when GHHLP approved the resignation of M.J. Benzer Company as general partner. At that point, QTC Company became the successor general partner in GHHLP. The Court has no record of M.J. Benzer Company moving for summary judgment in this matter.

| | | |
|---|---|---|
| **Count 11**<br>Fraud and Misrepresentation | [------------   ------- N/A ---------] | [----------   SJ Motion   ----------   ---------]<br>Pending |
| **Count 12**<br>Account Stated | [------------   ------- N/A ---------] | No<br>Motions<br>Pending    [-------------   N/A ---   ---------] |
| **Count 13**<br>Quantum Valebant | [------------   Cross Motions   ----------]<br>Pending | [-------------   N/A ---   ---------] |
| **Count 14**<br>Action Against HUD for<br>Undisbursed Mortgage<br>Proceeds Pursuant to the<br>National Housing Act, 12<br>U.S.C. § 1701 et seq. | Cross<br>Motions<br>Pending | [------------------------   ----------   N/A -------   ----------   ---------] |

The Court has heard oral argument on the motions, and its decision follows below.

### Legal Standard

Summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003) (citing FED. R. CIV. P. 56(c)). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the Court views the evidence and draws all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). But that does not mean that any amount of evidence, no matter how small, will save a nonmoving party from losing on a motion for summary judgment. *Scott v.*

*Harris*, 127 S. Ct. 1769, 1776 (2007).  When the nonmoving party's version of the facts is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Id.*

## Core Equitable Claims

Barnes raises several equitable claims against HUD, Centennial and GHHLP (Counts III; V; VI; VII; XIII; and XIV), and each of these defending parties has moved for summary judgment on those claims.

### *Equitable Claims against GHHLP*

A construction contract already governs the relationship between GHHLP and Barnes in this matter.  Barnes's remedy against GHHLP lies in contract, and Barnes is not entitled to equitable relief against GHHLP.  Accordingly, the Court will grant summary judgment to GHHLP as to Counts III; V; VI; VII; VIII; and XIV.  Barnes's claims against GHHLP for breach of contract and account stated, Counts II and XII in this case, remain pending.

### *Equitable Claims against HUD and Centennial*

Barnes's equitable claims form the core of its case against HUD and Centennial. Barnes asserts under a variety of equitable theories that HUD and Centennial have, in essence, received value without paying for it and therefore have been unjustly enriched. While few published cases address similar circumstances under the Section 221(d)(4) program, there exists a series of analogous cases under other, comparable HUD programs.

The leading case is *Trans-Bay Engineers and Builders, Inc. v. Hills,* 551 F.2d 379 (D.C. Cir. 1976). *Trans-Bay* involved the development of real estate under Section 236 of the National Housing Act. *Trans-Bay*, 551 F.2d at 373. HUD's approved contracts and other documents controlled most aspects of the transaction. *Id.* at 379. The construction contract authorized the payment of monthly draws minus a 10% retainage, which was to be paid 30 days after completion of construction, as long as certain conditions were satisfied. *Id.* at 374-75. The contractor completed construction and met all conditions for payment of the retainage. *Id.* at 375. HUD released half of the accrued retainage to the contractor, but refused to release the remainder of the funds until after a final closing, which could not occur, because the project owner had defaulted. *Id.* The mortgagee assigned the mortgage to HUD, and HUD foreclosed. *Id.*

The *Trans-Bay* court found that HUD had been unjustly enriched by the value of construction services for which it had not paid. *Id.* at 382. In so concluding, the court emphasized that "HUD was not merely the mortgage insurer . . . it was the guiding spirit behind the entire project. The record reveals a very high level of involvement by HUD." *Id.* at 381. The court observed that HUD inspected and approved the construction plans; that any changes had to be approved by HUD; that HUD inspectors monitored the progress of construction; and that HUD drafted all the contracts used in the transaction. *Id.* Therefore, the court reasoned, "[i]t is neither fair nor realistic to treat HUD as a mere mortgage insurer in this transaction, defining its exposure solely on the basis of the mortgage

insurance document . . . [t]his was not a typical marketplace transaction." *Id.*  The court highlighted the unique exposure of the general contractor in the case, commenting that the mortgage company was fully insured on its loan by HUD; HUD had the remedy of foreclosure; and that the project owner's losses were limited to the project itself. *Id.* at 382. In contrast, the contractor alone lacked protection. *Id.*  The court concluded that HUD had been unjustly enriched, that the contractor was entitled to equitable relief, and that the undisbursed mortgage proceeds constituted an identifiable *res* on which an equitable lien could be placed.

*Trans-Bay* differs from the case before the court in that the project owner was a non-profit corporation developing a project intended for low and moderate income tenants, and in that the contractor completed construction.  Two more factually similar cases, though arising under HUD's Section 236 program, are *S.S. Silberblatt, Inc. v. East Harlem Pilot Block Building 1 Housing Development Fund. Co.*, 608 F.2d 28 (2d Cir. 1987), and *Spring Construction Co. v. Harris*, 562 F.2d 933 (4th Cir. 1977).  In each of these cases, the owner defaulted before the contractor completed its work.  *See Silberblatt*, 608 F.2d at 31; *Spring Construction*, 562 F.2d at 935.  In *Silberblatt*, the lender declared the owner in default after completion of approximately 90% of the construction.  *Id.* at 33.  The contractor alleged that the undisbursed mortgage proceeds constituted a fund that could be attached, and it sought to recover the accrued retainage as well as other amounts for completed work.  *See id.* at 41. The court held that the contractor was entitled to equitable relief even though HUD did not

receive a completed structure, because HUD still received a benefit in the form of goods and materials worth 10% (the retainage amount) more than the amount paid to the contractor. *See id.* at 37.

Similarly, in *Spring Construction*, the court found that the contractor was entitled to equitable relief, even though it did not complete the project, and even though HUD sold the project at a loss, as in this case. *Id.* at 937-38. The court found an identifiable *res* for the imposition of a lien in two respects: first, the accrued retainages; and second, the balance of undisbursed loan proceeds that were intended to compensate those who constructed the project. *Id.* at 937. Although the *Spring Construction* court cited *Trans-Bay*, the court did not specifically focus on the special features of the Section 236 program that the *Trans-Bay* court had cited as additional considerations in imposing an equitable lien.

HUD relies primarily on two cases, *Van-Tex, Inc. v. Pierce*, 703 F.2d 891 (5th Cir. 1983), and *Taylor Woodrow Blitman Construction Corp. v. Southfield Gardens Co.*, 534 F. Supp. 340 (D. Mass. 1982), to support its contention that Barnes has no right to an equitable lien. *Taylor Woodrow Blitman* arose under § 236. The Court denied the contractor's claim that HUD had been unjustly enriched, because the contractor had remedies at least available to it. *Id.* at 347–48. *Taylor Woodrow Blitman* differs significantly from this case, however, because the construction contract in that case allowed the contractor to file a lien for non-payment. *Id.* at 348-49. The *Taylor Woodrow Blitman*

16

court also reasoned that in contrast to *Trans-Bay*, the owner was "not an assetless, non-profit corporation, but a presumably credit-worthy one." *Id.* at 348.

*Van-Tex* involved HUD's 221(d)(4) program. In *Van-Tex*, the mortgage lender regularly advanced to the contractor construction funds minus a 10% retainage. *Van-Tex*, 703 F.2d at 893. Around the time construction was substantially completed, the owner defaulted. *Id.* at 894. Ultimately, HUD took ownership of the property, and sold the property at a loss. *Id.* Because the owner had defaulted, the retainage was never paid out. *Id.* The *Van-Tex* court distinguished the factual scenario before it from that in *Trans-Bay*, holding that because the contractor in *Van-Tex* had available to it other remedies, the contractor was not entitled to equitable relief. *Id.* at 897. The court pointed out that the largest general partner in the project owner had substantial assets and that other partners were presumptively solvent. *Id.* The court found that the contractor lacked a reasonable expectation that HUD would make good on any sums due it under the construction contract. *Id.* "So long as the owner-sponsor, unlike the typical § 236 owner-sponsor, had assets, the contractual remedy remained presumptively available." *Id.*

A more recent case significant to the Court's analysis is *J.J. Deluca Co. v. United States Department of Housing & Urban Development*, No. 04-4344 (MLC), 2008 WL 723329 (D.N.J. Mar. 14, 2008) (*vacated on other grounds*).[2] *Deluca* involved the construction of an assisted living facility insured under Section 232 of the National Housing

---

[2] It appears that after the decision issued, the parties entered into a settlement agreement, the terms of which included vacating the court's decision.

Act, which authorizes HUD to insure loans for the development of assisted living facilities for the care elderly persons. *Deluca*, 2008 WL 723329, at *1. The contractor completed the construction work required under the construction contract and submitted a certificate certifying the total cost of the construction. *Id.* at *3. A HUD representative disallowed a small part of the submitted amount but approved the remainder. *Id.* But the contractor did not receive payment, because the lender declared the owner in default before HUD issued its final endorsement. *Id.* at *4. The contractor sued HUD, seeking to recover the difference between the amount HUD had certified and the amount it had been paid; costs for change orders that were deemed necessary but not approved by HUD; and applicable costs and interest. *Id.* Noting the absence of cases addressing loans insured under Section 232, the court looked to Section 236 cases, including *Trans-Bay*, for guidance. *Id.* at *6-*8. While the court acknowledged *Van-Tex* implicitly, it neither discussed nor cited that case. *See id.* at *9. The court concluded that equitable relief was appropriate in light of HUD's significant involvement in the project, including its appraisals, evaluations, meetings with the owner, structuring of the transaction, and its control over the disbursement of funds. *See id.* at *11. Also, as in this case, the court pointed out that HUD approved the project over initial recommendations to reject it. *Id.* at *12. It did not affect the court's analysis that the owner was a for-profit entity, primarily because the owner had no assets of its own other than the project. *Id.* While *DeLuca* has since been vacated, following a settlement, the DeLuca court's reasoning offers useful guidance.

HUD asserts that the current situation differs significantly from that in *Trans-Bay*, *Silberblatt*, *Spring Construction, and Deluca,* and urges the court to follow *Van-Tex*. Although HUD contends that *Van-Tex* essentially stands for the proposition that *Trans-Bay* type equitable relief is not available in Section 221(d)(4) cases, the case did not establish such a broad rule.  Rather, the court emphasized the presumptive creditworthiness of the owner, noting particularly the large net worth of one of the general partners.  *Van-Tex* left open the possibility that a contractor might demonstrate that the owner – even a for-profit owner – was thinly capitalized and had no other substantial assets beyond the property protecting HUD against loss.  Barnes has done exactly that.

Little basis appears for the asserted distinction between non-profit and for-profit owners in these HUD-insured transactions.   The entire structure of the transaction encourages the formation of thinly-capitalized entities: (1) the owner entity is limited to a single asset (to which HUD and the lender alone may look to for security); (2) the loan is non-recourse, so the owners have no liability beyond any partnership assets; (3) HUD and the lender provide almost 100% financing; and (4) the loan proceeds are the only means of paying for the work on the project.  *See Deluca*, 2008 WL 723329, at *12 ("The Court sees little difference between HUD's decision here to proceed with a Section 232 project owned and sponsored by an inexperienced company whose only asset was the underlying project, and those cases involving a Section 236 project owned and sponsored by a non-profit asset-less organization.").  GHHLP had insufficient capital to pay its creditors, and its general partner had no assets.  Further, the plan of the limited partners had been to make an initial

capital contribution that would be repaid by the partnership at closing, so that the limited partners effectively would have no funds at risk in the project. This was not a typical marketplace transaction.

The Court's unjust enrichment analysis applies to Centennial as well as HUD, because the two were so closely intertwined in this transaction.  As a MAP lender, Centennial had HUD-prescribed obligations under HUD's MAP Guide and worked hand-in-glove with HUD.  For example, the Map lender performs a complete underwriting of the application to participate in the Section 221(d)(4) Program.  While HUD approves the initial and final draws on the loan, the MAP lender prepares and approves the documents for draws during the course of construction.  Further, whether or not at HUD's instruction, Centennial applied the letters of credit to the balance of the loan, reducing the amount of the insurance claim it filed.  There was embedded value in the foreclosure rights that would not have been there had Centennial not applied the letters of credit, which had been designated for other purposes.

There remain genuine issues of material fact for trial regarding whether, and if so in what amount, HUD and Centennial have been unjustly enriched.  Accordingly, the court will deny summary judgment to HUD, Centennial and Barnes on the core equitable claims.

### Third Party Beneficiary (Count IV)

Barnes also asserts that it is entitled to relief as a third-party beneficiary of the loan agreement between Centennial (and HUD, as Centennial's assignee), and GHHLP.  Courts have repeatedly held in cases involving HUD programs that a contractor in a position such

as Barnes's may sue as a third-party beneficiary. *Bennett Constr. Co. v. Allen Gardens, Inc.*,

433 F. Supp. 825, 831 (D.C. Mo. 1977) (citing *Trans-Bay*, 551 F.2d at 378; *American Fid.*

*Fire. Ins. Co. v. Construcciones Werl.*, 407 F. Supp. 164, 180-83 (D.V.I. 1975); *Travelers*

*Indem. Co. v. First Nat'l State Bank of N.J.*, 328 F. Supp. 208, 211 (D.N.J. 1971)); *accord*

*Spring Constr.*, 562 F.2d at 936.  Under Barnes's theory, Barnes would step into the shoes

of GHHLP.  However, GHHLP undisputedly defaulted on the loan.  Barnes acknowledges

that a third-party beneficiary of the loan would have no rights to disbursements following

the default, but insists that it has rights to payments under the loan that precede the default.

Earlier cases do not support Barnes's argument, however.  "[T]he lender's *contractual* duty

to release the holdbacks . . . does not arise until construction has been completed." *Van-Tex*,

703 F. Supp. at 898[3].  Because GHHLP defaulted on the loan well before construction was

complete, Barnes has no rights as a third-party beneficiary under the loan agreement.

### Negligent or Innocent Misrepresentation (Count VIII); Fraud and Misrepresentation (Count XI)

Fraudulent misrepresentation requires a plaintiff to prove that (1) the defendant made

a material representation; (2) the representation was false; (3) the defendant knew at the time

he or she made the representation that it was false, or the defendant made the representation

recklessly, without knowledge of its truth; (4) the defendant intended that the plaintiff act

on the representation; (5) the plaintiff acted in reliance on the representation; the plaintiff

---

[3] Of course, based on the Court's earlier equitable analysis, the contractual retainages may be wholly or partially subject to distribution in equity, rather than in contract.

suffered injury due to his or her reliance on the representation.  *The Mable Cleary Trust v. The Edward-Marlah Muzyl Trust*, 262 Mich. App. 485, 499 (citing *Hord v. Envt'l Research Inst. of Michigan* (*after remand*), 463 Mich. 399, 404 (2000).  Silent fraud requires the existence of a legal or equitable duty of disclosure.  *Roberts v. Saffell*, __N.W. 2d.__ (Mich. App. 2008) (citing *United States Fid. & Guar. Co. v. Black*, 313 N.W.2d 77 (1981)).  Further, "to prove a claim of silent fraud, a plaintiff must show some type of representation by words or actions that was false or misleading and was intended to deceive." *Id.*, (citing *M & D Inc. v. McConkey*, 231 Mich. App. 22, 31–32, 36 (1998)).  Innocent misrepresentation requires that the following elements be satisfied: (1) the misrepresentation occurred in a transaction between the two parties; (2) the misrepresentation is false in fact and deceives the other; (3) the deceived party relies on the misrepresentation detrimentally; and (4) the loss of the party deceived inures to the benefit of the other.  *United States Fid. and Guar. Co. v. Black*, 412 Mich. 99, 116-117 (1981).

Judge Quist's earlier opinion dismissed Barnes's claims of misrepresentation against HUD.  *C.D. Barnes Assoc. v. Grand Haven Hideaway Ltd. Partnership*, 406 F. Supp. 2d 801, 810-11 (W.D. Mich., Dec. 23, 2005).  As to Centennial, Barnes cannot point to any affirmative representations.  Rather, Barnes argues that by keeping silent during phone calls in which Mr. Straatsma encouraged Barnes to continue working on the project, Mr. Kane tacitly advised Barnes to continue working, even though he knew that GHHLP was at great financial risk.  Mr. Kane's silence in this context is simply not enough to form the basis of a claim of misrepresentation, whether negligent or innocent.  Barnes has not shown that

Centennial misrepresented any facts or that Centennial had a duty to speak.  Centennial and Barnes were operating at arm's length, and in the absence of an affirmative misrepresentation, Barnes cannot make its claim.  Accordingly, summary judgment in favor of Centennial on the misrepresentation claim is appropriate.

Similarly, Barnes has adduced scant evidence to support its misrepresentation claim against GHHLP.  Barnes suggests that GHHLP falsely represented to Barnes that Barnes would be paid for work inspected and approved, and that GHHLP provided Barnes with inaccurate building plans.  However, there is absolutely no evidence to suggest that GHHLP knew or even should have known that it would be unable to pay Barnes for work inspected or approved, as would be required to support a claim of fraudulent misrepresentation.  And in no way did GHHLP's failure to pay Barnes for work inspected and approved inure to GHHLP's benefit, as would be required to support a claim of innocent misrepresentation.  Nor has Barnes offered evidence to show that GHHLP knew or should have known that the construction plans were inaccurate, or that any inaccuracies inured to GHHLP's benefit.  Because Barnes has not supported essential elements of its claims of negligent or innocent misrepresentation, GHHLP is entitled to summary judgment on those claims.

Finally, Barnes has not raised a genuine issue of material fact in connection with its fraud and misrepresentation claim against GHHLP, QTC, Mr. George and Mr. Boote.  There is no evidence to suggest that any of these parties knowingly made false representations to Barnes, whether through their words or actions.  Accordingly, GHHLP, QTC, and Messrs.

George and Boote are entitled to summary judgment on Barnes's fraud and misrepresentation claim against them.

### Claims against Limited Partners (Counts IX, X)

Barnes asserts that Messrs. George and Boote, though they were limited partners, essentially functioned as general partners of GHHLP and so are jointly and severally liable for the partnership's obligations.  The court disagrees.  Barnes is a Delaware limited partnership governed by Delaware law.  *See* MICH. COMP. LAWS § 449.1901 (2008). Delaware law provides that if a limited partner participates in the control of the business, "he or she is liable only to persons who transact business with the limited partnership reasonably believing, based upon the limited partner's conduct, that the limited partner is a general partner."  DEL. CODE ANN. tit. 6, §17-303.  Barnes, as a limited partner of GHHLP, had actual knowledge that neither Mr. George nor Mr. Boote was a general partner.  Further, even if Barnes did believe Mr. George and Mr. Boote to be general partners based on their conduct, the conduct Barnes claims inspired its belief falls within one or more safe harbor provisions for exercising authority delegated under a limited partnership agreement or being an agent of the limited partnership. *See id.*, §17-303(b)(8)(o) and §17-303(b)(1).  Because they were not general partners, and Barnes knew they were not general partners, and because in any event, their conduct fell within statutory safe harbors, Messrs. George and Boote have no liability as general partners.  Accordingly, they are entitled to summary judgment on Count IX.

Messrs. George and Boote, as limited partners, and QTC, the ultimate general partner, are also entitled to summary judgment on Count X, which alleges breach of fiduciary duties by the general partner. Delaware law governs the duties of partners in a Delaware limited partnership. *See* MICH. COMP. LAWS § 449.1901 (2008). The Limited Partnership Agreement does not provide for a fiduciary relationship among the partners, nor does the Delaware statute concerning limited partnerships establish fiduciary duties. Delaware's enactment of the uniform partnership act, DEL. CODE ANN. tit. 6 § 15-404 delineates the fiduciary duties a partner owes:

(a) The only fiduciary duties a partner owes to the partnership and the other partners are the duty of loyalty and the duty of care set forth in subsections (b) and (c).

(b) A partner's duty of loyalty to the partnership and the other partners is limited to the following:

1. to account to the partnership and hold as trustee for it any property, profit or benefit derived by the partner in the conduct or winding up of the partnership business or affairs or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity;

2. to refrain from dealing with the partnership in the conduct or winding up of the partnership business or affairs as or on behalf of a party having an interest adverse to the partnership; and

25

3. to refrain from competing with the partnership in the conduct of the partnership business or affairs before the dissolution of the partnership.

(c) A partner's duty of care to the partnership and the other partners in the conduct and winding up of the partnership business or affairs is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of the law.

There is no evidence that Mr. George or Mr. Boote (both as a limited partner and in his capacity as president of QTC) violated any of these duties. Rather, Messrs. George and Boote had incentive to and did try to see to it that the Project could be completed and sold. Nor did Mr. George, Mr. Boote or QTC benefit at Barnes's expense. Summary judgment for Messrs. George, Boote and QTC on Count X is appropriate.

### Conclusion

Barnes's core equitable claims against HUD and Centennial present issues for trial, and the Court will therefore deny Barnes's, HUD's and Centennial's motions for summary judgment as to those claims (Counts III, V, VI, VII, XIII, and XIV). No genuine issue of material fact exists regarding Barnes's third-party beneficiary claim against HUD and Centennial, and HUD and Centennial are entitled to summary judgment on that claim (Count IV). Nor is there a genuine issue of material fact as to Barnes's claim of negligent or innocent misrepresentation against Centennial and GHHLP, and Centennial and GHHLP are entitled to summary judgment on that claim (Count VIII). Similarly, no genuine issue of material fact exists as to Barnes's claim of fraud and misrepresentation against GHHLP,

QTC, and Messrs. Boote and George; each of these parties is entitled to summary judgment on that claim (Count XI).  There is no genuine issue of material fact concerning Barnes's claims of liability of limited partners and breach of fiduciary duty by general partners. Messrs. George and Boote are entitled to summary judgment on each of these claims (Counts IX and X), and QTC is entitled to summary judgment on the claim of breach of fiduciary duty (Count X).

An order reflecting the Court's decision in this matter will issue separately.


Dated:    September 30, 2008         /s/ Robert J. Jonker
                                     ROBERT J. JONKER
                                     UNITED STATES DISTRICT JUDGE